UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                        Plaintiff,

        -against-

WENDY REYES,

                       Defendant.

11 Cr. 58 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Before the Court is defendant Wendy Reyes's motion to suppress (1) physical evidence, including a stack of money and a bag of heroin, obtained during a search of the vehicle Reyes was driving on the day of his arrest, January 4, 2011, and (2) statements he made during the search and after the arrest.  Reyes's motion also seeks to require the government to provide certain pretrial disclosures.  Evidentiary hearings were held on September 23, 2011 and October 21, 2011.  After reviewing the evidence and the parties' post-hearing submissions, the Court finds that oral argument is unnecessary in this matter.  For the reasons that follow, Reyes's motion is DENIED.

**BACKGROUND**

      The government offered testimony from two Drug Enforcement Agency ("DEA") agents, Special Agents Matthew McCoy and Claudia Caballero, both of whom were present for Reyes's arrest.  The defendant did not testify.  The evidence established the following facts.

      On January 4, 2011, DEA agents, including McCoy and Caballero, were conducting surveillance outside of 400 Third Avenue in Manhattan.  The agents believed that an apartment

at that address was used by Reyes's co-defendant Alvin Aviles as a "stash house" for drugs. (Tr. I (Sept. 23, 2011) at 9-10.)

DEA agents had begun an investigation of Aviles in November, 2010. (Tr. I at 5.) Prior to January 4, 2011, DEA agents had conducted surveillance of Aviles on at least two other occasions: December 13, 2011 and December 15, 2011. (Tr. I at 8-9, 42-43.) Through their investigation, DEA agents learned that Aviles rented a residence in New Jersey. (Tr. I at 32-33.) The agents also observed Aviles spending short periods of time (usually less than one hour) at the apartment building located at 400 Third Avenue in Manhattan. (Tr. I at 5-6.) Agents learned that the apartment Aviles would visit was rented to Amparo Lopez, who also was listed as a resident of Aviles's home in New Jersey. (Tr. I at 6-7, 36.) Lopez had no criminal record. (Tr. I at 36.)

The agents never observed Aviles spend the night at 400 Third Avenue, nor did they observe him go to any place of employment during daytime hours. (Tr. I at 5, 9, 44-46.) In addition, Aviles had a criminal record, including at least two convictions relating to narcotics. (Tr. I at 30, 107-08.) The agents also learned that Aviles had purchased a money-counter, which, according to Agent McCoy, is a common tool used in the drug trade. (Tr. I at 9.) Agent McCoy could not remember when Aviles had purchased the money-counter, but based on his testimony, it is reasonable to infer that the money-counter was purchased close in time to the beginning of the DEA investigation.

On December 13, 2011, agents observed Aviles drive his Toyota Tundra to a restaurant located on Avenue D in Manhattan. Agents observed Aviles engage in conversations with a number of individuals who were standing outside the restaurant. While Aviles was outside, a rental car pulled up to the restaurant. After Aviles and the driver of the rental car greeted each

other outside the rental car, they looked into the back seat of the rental car, nodded, and had a brief conversation.  The two men then walked over to Aviles's truck, looked in the back seat of the truck, and nodded to each other again.  Aviles then drove the rental car to 400 Third Avenue. After entering the apartment for a short time, Aviles returned the rental car to Avenue D and drove off in his truck.  Although no agent was able to see the contents of the vehicles, Agent McCoy described the transaction as "pretty much a classic drug exchange." (Tr. I at 7-8.)  The agents later learned that the rental car also was registered to Aviles. (Tr. I at 8.)

The events involving Reyes occurred on January 4, 2011.  On that day, around 12:50 p.m., the agents observed Aviles entering the apartment building at 400 Third Avenue holding a red bag.  Aviles left the building a few minutes later without the bag and drove away in his Toyota Tundra truck. (Tr. I at 11.)

Aviles returned to the area an hour later.  After parking his truck, he walked up to a silver Honda Accord parked in front of 400 Third Avenue and entered the vehicle through the passenger side door.  Defendant Reyes was sitting in the driver's seat of the Accord. (Tr. I at 12-13.)  The two men conversed for approximately thirty to forty-five seconds, and Aviles then went into 400 Third Avenue.  He returned a few minutes later holding the red bag.  Agent McCoy and at least one other agent observed Aviles hand the red bag to Reyes through the driver's side window of the Accord. (Tr. I at 13.)

Agent Caballero testified that she did not see Aviles hand the bag to Reyes because her view was obstructed. (Tr. II (Oct. 21, 2011) at 39.)  Caballero also testified that she saw Aviles still holding the red bag when he turned on 29th Street. (Tr. II at 41.)  This would have been after the time that Aviles allegedly handed the bag to Reyes.  Though this portion of Caballero's testimony is inconsistent with McCoy's, it does little to shed doubt on the credibility of McCoy's

testimony that he saw Aviles hand the bag to Reyes.  When Caballero was testifying on this

point, she was confused about the proper way to describe her location to defense counsel and to

describe the actions she saw Aviles make. (*See* Tr. II at 39, 40, 41.)  In addition, the fact that

Caballero could not see the alleged hand-off while McCoy testified that he could leads the Court

to conclude that McCoy's testimony on this point is credible, despite the ostensible inconsistency

with Caballero's testimony.

After receiving the bag, Reyes activated his turn signal and drove north on Third Avenue.

The agents followed him in five unmarked cars. (Tr. I at 14-15.)  Due to the traffic on Third

Avenue, Agent McCoy followed Reyes more closely than he otherwise would have in order to

avoid losing Reyes.  Agent McCoy observed Reyes change lanes suddenly and without signaling

between three and five times.  Agent McCoy described Reyes's driving as "basically bouncing—

trying to slalom through two lanes." (Tr. I at 16.)  Agent McCoy testified that he believed Reyes

had noticed the agents' surveillance and was trying to evade them. (Tr. I at 15-16.)  At the

intersection of 47th Street and Third Avenue, McCoy turned on his siren and pulled Reyes over.

Agent McCoy pulled his vehicle behind Reyes's vehicle, while another DEA vehicle pulled in

front of Reyes, and a third pulled up to the right.  The left side of Reyes's vehicle was blocked by

cars parked next to the curb. (Tr. I at 16-17.)

Agent McCoy then approached the driver's side of the vehicle on foot.  He testified that

he walked quickly but did not run.  He also testified that he had his hand on his holstered gun but

that he did not draw the gun. (Tr. I at 17, 75.)  Two other agents exited their vehicles and stood

near the front of Reyes's Accord.  Two more agents stood near the rear passenger's side of

Reyes's Accord.  None of the agents drew their guns, but, upon exiting their vehicles, they did

place their hands on their holstered weapons. (Tr. I at 20, 77-78.)

Agent McCoy approached the driver's side window and identified himself as law enforcement. He asked Reyes in English to turn off the engine and Reyes complied. He then asked Reyes to hand him the keys and also to present identification. Reyes complied again. After taking both the keys and Reyes's driver's license, Agent McCoy asked Reyes to step out of the car, which Reyes did. They two then walked to the rear of the car. (Tr. I at 18-19.)

Agent McCoy asked Reyes if he had any weapons. Reyes responded that he did not. Agent McCoy then told Reyes that he needed to do a "quick pat down" of Reyes just to make sure. Agent McCoy then briefly frisked Reyes. (Tr. I at 19-20.)

Agent McCoy then asked Reyes if the agents could search the vehicle. Reyes said that the car belonged to his friend, but nonetheless told Agent McCoy in substance, "'Yeah, go ahead, search whatever you want.'" (Tr. I at 19-20, 92, 96.)

While searching the vehicle, one of the agents observed approximately $400 in cash in plain view in the console between the driver's and passenger's seats. When questioned about the money, Reyes told the agents that his English was not too good and that he would prefer Spanish. Shortly after Reyes made this request, Agent Caballero arrived on the scene and began translating for Reyes. With respect to the money, Reyes told the agents that the money was his and that he had left it in the car overnight. (Tr. I at 21-22.) The agents also asked Reyes (through Agent Caballero's translation) whether they could search the Accord's trunk. Reyes again responded that the car belonged to his friend but that the agents could search the trunk. (Tr. I at 25.)

In response to additional questioning, Reyes said that he lived in northern Manhattan but drove downtown to get his pants fixed and that he had not stopped anywhere after going to the tailor. When the agents told Reyes that they saw him in front of 400 Third Avenue, Reyes

5

admitted that he stopped there to talk to a man named Albert about a construction job.  When asked about the red bag, Reyes said he never took the red bag from Albert because Albert threw the bag on the ground, and thus the bag was back near 400 Third Avenue. (Tr. I at 22-23.)  Reyes was questioned by Agent McCoy and by another agent named Ed Maher.  Agent Caballero translated, but did not ask her own questions.  The other agents did not ask questions. (Tr. I at 98-99.)

After searching the entire vehicle, the agents were unable to locate the red bag and concluded that it was located in a hidden compartment, or "trap," somewhere in the vehicle.  At that point, the agents arrested Reyes and brought him, and his vehicle, to the DEA Field Office in Manhattan.  Reyes was read his Miranda rights at the Field Office.  He told the agents that he wanted to speak to a lawyer.  Reyes also claims that he was strip searched at the Field Office.  At the field office, the agents again searched the Accord and discovered a "trap" that contained the red bag.  Inside the red bag was a plastic bag containing a tan substance which field tests showed to be heroin.

Reyes made a variety of statements after he was formally arrested, but the government has stated that it does not intend to use any of those statements at trial.

## DISCUSSION

### I.    The Validity of the Vehicle Stop

#### A.  Terry Stop

A law enforcement officer may conduct a brief investigatory stop of a person, even in the absence of probable cause, provided that the officer has reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 7 (1968).  In determining whether reasonable suspicion exists, a court should look at the totality of the

circumstances, *see United States v. Sokolow*, 490 U.S. 1, 8 (1989), and properly may consider that law enforcement officers have experience and training that allow them to make observations and draw conclusions that a lay person might not. *United States v. Cortez*, 449 U.S. 411, 419 (1981); *see United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991).  The government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion exists. *United States v. Medina*, 301 F. Supp. 2d 322, 328 (S.D.N.Y. 2004).

An officer will be justified in making an investigatory stop of a person if the officer has reasonable suspicion to believe that the person violated traffic laws.  *See Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994).  This is true even if enforcing traffic violations is not a usual part of the officer's duties and even if the officer uses the traffic violation as a "pretext" to stop a person suspected of other criminal activity. *Scopo*, 19 F.3d at 781-82.  As long as the traffic stop is supported by specific and articulable facts of a traffic law violation, it will not violate the Fourth Amendment. *See United States v. Stewart*, 551 F.3d 187, 191 (2d. Cir. 2009) ("We have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment.").

Here, Agent McCoy testified that he observed the Accord Reyes was driving change lanes multiple times suddenly and without signaling.  Agent McCoy described Reyes's driving as "basically bouncing—trying to slalom through two lanes." (Tr. I at 16.)  Changing lanes without signaling is a violation of New York's traffic laws. *See* N.Y. Veh. & Traf. Law § 1163(d).  Because the Court finds Agent McCoy's testimony credible, it is clear the DEA agents had a reasonable suspicion that Reyes violated the traffic laws, and they accordingly were justified in stopping him.

In addition, the agents had a reasonable suspicion that Reyes was involved in drug trafficking.  The agents saw Aviles, a target of their narcotics investigation, approach the vehicle Reyes was driving, enter it for a few minutes, then enter the building where the alleged "stash pad" was located and return a few moments later to hand Reyes the red bag.  The relatively unusual nature of this encounter combined with the agents' information about Aviles's alleged illegal activities—including his criminal record (which included at least two narcotics convictions), his purchase of a money counter (a tool commonly used in the narcotics trade), the agents' observations of activity consistent with drug transactions (even though no drugs actually were seen), and Aviles's conduct with respect to the apartment at 400 Third Avenue—is enough to establish a reasonable suspicion that criminal activity "may be afoot." *Terry*, 392 U.S. at 7. Accordingly, the agents were justified in stopping Reyes to investigate further, and this line of Reyes's argument for suppressing the evidence must be rejected.

### B.  De Facto Arrest

Reyes argues that the stop quickly escalated into a "de facto" arrest, thus requiring probable cause, because the officers employed tactics more intrusive than necessary under the circumstances.  An investigatory stop may develop into an arrest, which must be supported by probable cause, "if, for example, the officers unreasonably used means of detention that were more intrusive than necessary" to effect the purposes of the stop. *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (citing *Florida v. Royer*, 460 U.S. 491 (1983)).  Factors to be considered on this point include "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being

armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *Id*. at 645 (internal citations omitted).

Here, the Court finds credible Agent McCoy's testimony that no guns were drawn, that Reyes was not forcefully removed from his vehicle, that Reyes was not handcuffed prior to his formal arrest, and that Reyes was not otherwise subject to physical restraint during the stop. These factors counsel against a finding of a de facto arrest. *See United States v. Castillo*, No. 00 CR. 549, 2002 WL 999279, at *4 (S.D.N.Y. May 15, 2002) (finding no de facto arrest where defendant was not forcefully removed from his vehicle, was not handcuffed, and "while there were four armed officers at the scene of the stop, none drew a weapon"); *see also United States v. Vasquez*, 638 F.2d 507, 521 (2d Cir. 1980) (finding no arrest until "the officers leveled their guns at the" defendants and ordered them out of their car). In addition, the agents' decision to box-in Reyes's vehicle was not unreasonable, given Reyes's evasive driving and the likelihood that he quickly would be lost in the traffic were he to pull away. "The fact that agents have used their cars to block a vehicle does not necessarily mean that, instead of a *Terry* stop, there was a *de facto* arrest." *Perea*, 986 F.2d at 636, 644 (finding no arrest where "as many as six" police cars followed the defendant's vehicle with sirens activated and where government vehicles blocked the defendant's vehicle "in front and back and on one side"). The same holds true for the agents' decision to ask Reyes for his car keys. Finally, although the stop involved as many as six agents standing near Reyes's car, none had their guns drawn and it does not appear that they swarmed the vehicle or otherwise surrounded it in a manner more intrusive than necessary to ensure that Reyes did not attempt to drive off prior to questioning. Accordingly, the Court finds that the stop did not escalate into a de facto arrest at any time before Reyes gave consent to search the vehicle, as discussed below.

II.     **The Vehicle Search**

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam). However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004) (citing *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983)). Consent is voluntary when it is "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Id.* (quoting *Garcia*, 56 F.3d at 423). The answer to that question is determined by looking at the totality of the circumstances. *Id.*

Here, the totality of the circumstances indicates that Reyes's consent was voluntary. When the agents asked Reyes if they could search his vehicle, he informed them, in English, that it was his friend's vehicle but that the agents could "search whatever you want." (Tr. I at 20.) There is no indication that the agents threatened Reyes into giving his consent. None of the agents drew their guns, Reyes was not physically restrained, and there is no evidence that any agent said anything to Reyes to suggest that his refusal to give consent would have negative consequences. *See Isiofia*, 370 F.3d at 232-33 (upholding a finding that defendant's consent was invalid where there was evidence in the record that law enforcement told defendant that "if [he] did not provide [his] consent, [he] would be jailed and deported and would never see [his] family again"). Although a number of the agents had their hands on their holstered weapons when

Reyes's vehicle was first stopped, that no longer was the case at the time Reyes was asked for consent.  In addition, Reyes's contention that he did not understand English well enough to consent is unavailing.  Reyes followed a number of Agent McCoy's instructions without difficulty before indicating that he would prefer to speak Spanish.  Only when the agents' questions became more detailed did Reyes inform the agents that his English was not excellent. Moreover, with the aid of Agent Caballero's translation, Reyes gave consent a second time for the agents to search the Accord's trunk.  And while Caballero testified that as she approached the scene, Reyes told her in Spanish, "I don't know what's going on," (Tr. II at 57), that statement more likely referred to Reyes's understanding (or lack thereof) of the situation as a whole, and not to his lack of understanding of the questions he had been asked.  Under these circumstances, the government has shown by a preponderance of the evidence that Reyes's consent was voluntary.

To the extent Reyes argues that the search of his vehicle at the DEA field office exceeded the scope of his consent, the issue is not material.  As discussed below, at the time the agents arrested Reyes, they had probable cause to believe he was involved in narcotics trafficking and that his vehicle contained narcotics.  Thus, the search of any part of his vehicle that may have contained narcotics was justified based on the automobile exception to the warrant requirement. *See United States v. Ross*, 456 U.S. 798, 825 (1983) (when officers have probable cause to search a vehicle, they may search "every part of the vehicle and its contents that may conceal the object of the search").  Accordingly, the government's search of Reyes's vehicle was valid and Reyes's motion to suppress physical evidence obtained as a result of the search is DENIED.

### III.    Reyes's Statements to the Agents

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A person is in custody for purposes of *Miranda* when he or she is subject to "a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

Ordinary traffic stops generally do not trigger law enforcement's obligation to administer Miranda warnings. *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984).  They may, however, trigger the obligation if the "'traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001) (quoting *Berkemer*, 468 U.S. at 437).  Factors to be considered on this point include "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion," and "the nature of the questions asked." *United States v. Fnu Lnu*, 653 F.3d 144, 153 (2d Cir. 2011) (citations omitted).  The *Miranda* inquiry is separate from the reasonableness inquiry under the Fourth Amendment. *See United States v. Newton*, 369 F.3d 659, 673-75 (2d Cir. 2004) (finding that the defendant was not subject to a de facto arrest but nonetheless was in custody for *Miranda* purposes).

12

Here, a number of facts support Reyes's argument that he was in custody during the stop. He was questioned by agents for approximately forty-five minutes, *see Berkemer*, 468 U.S. at 442 n.34 (citing with apparent approval a case where a suspect held for thirty minutes in a patrol car was in custody); he was frisked briefly by Agent McCoy; and there were six agents present at the scene, all of whom were armed, and all of whom, at least when the stop was first initiated, placed their hands on their holstered weapons. On the other hand, the questioning took place on a public street; no guns were drawn; no physical restraints were used, apart from the brief frisk; and only two of the agents actually asked Reyes questions, although a third agent provided translation. On balance, the factors that suggest Reyes was in custody fail to outweigh the factors that indicate he was not. Accordingly, the Court concludes that Reyes was not subject to "pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" *Cruz*, 255 F.3d at 83. Accordingly, Reyes's motion to suppress statements made prior to his formal arrest is DENIED.

## IV.  Probable Cause to Arrest

Probable cause exists where the facts and circumstances known to the officers and "'of which they had reasonably trustworthy information'" are "'sufficient in themselves to warrant a man of reasonable caution in the belief that'" a crime has been committed. *See United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." *Id.* at 457 (quoting *Gates*, 462 U.S. at 238). Moreover, "courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *Id.* (citations omitted).

At the time of Reyes's arrest, the agents were aware that Reyes had taken a red bag from Aviles and placed it in his car in a relatively unusual transaction. The agents also were aware that Aviles had a record of convictions for narcotics offenses; exhibited behavior consistent with the operation of a "stash pad" at 400 Third Avenue; engaged in a transaction that the agents identified as a typical drug exchange; and owned a money-counter, a tool commonly used in the drug trade. In addition, the agents were unable to locate the red bag after searching Reyes's vehicle, despite the fact that at least two agents directly observed Reyes take possession of the bag and no agent ever observed Reyes throw anything from his vehicle at any time. Moreover, Reyes told the agents that he had never taken possession of the bag, despite the agents' direct observations to the contrary. Given these facts known to the agents, the agents had probable cause to arrest Reyes for possession of narcotics. *See United States v. Polanco*, No. 10 Cr. 627, 2011 WL 240140, at *9 (S.D.N.Y. Jan. 19, 2011) (finding probable cause to arrest livery cab driver where narcotics suspect placed two suitcases in the trunk of the driver's cab, where narcotics suspect and cab driver did not exchange money, and where narcotics suspect did not enter the cab but instead walked away in the opposite direction as the cab drove off).

### V.        Defendant's Motion for Pretrial Disclosures

Reyes moves to compel the government to provide certain items of discovery required by Federal Rule of Criminal Procedure 16. The government already has provided Reyes with most of what he requests. To the extent the government has already complied with Rule 16, Reyes's motion is DENIED as moot.

Reyes also moves to require the government to provide a list of witnesses it plans to call at trial. The government has no obligation to provide such a list, *see United States v. Alessi*, 638 F.2d 466, 481 (2d Cir. 1980), and, while the Court may order such disclosure in its discretion,

Reyes has not made the requisite showing of "specific evidence of the need for disclosure." *United States v. Cannone*, 528 F.2d 296, 302 (2d Cir. 1975).  Accordingly, Reyes's motion is DENIED in this respect.

Reyes also moves to compel the government to produce Jencks Act Material, *Brady* material, *Giglio* material, and Rule 404(b) evidence.  The government responds that it will provide these materials closer to trial, as the law requires.  Accordingly, the remainder of defendant's motion is DENIED.

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress [15] is DENIED.

SO ORDERED.

Dated: New York, New York
       February __, 2012

_____
Richard J. Holwell
United States District Judge

16